No. 95-446

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 191

RUSSELL EDWARD DORWART and

HARRY DORWART,

Plaintiffs, Appellants and

Cross-Respondents,

v.

PAUL CARAWAY, individually and as a deputy in the Stillwater

County Sheriff's Office; DANNY AMES, individually and as a

deputy in the Stillwater County Sheriff's Office' CLIFF BROPHY,

individually and as Sheriff of Stillwater County, Montana; and

COUNTY OF STILLWATER, State of Montana,

Defendants, Respondent and

Cross-Appellants.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Stillwater,

The Honorable Maurice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Gary R. Thomas (argued); Thomas Law Office, Red Lodge, Montana

For Respondents:

Steven R. Milch (argued); Crowley, Haughey, Hanson, Toole & Dietrich,

Billings, Montana

For Amicus:

Hon. Joseph P. Mazurek, Attorney General; Clay R. Smith, Solicitor,

Helena, Montana

Argued: June 12, 1997

Submitted: July 15, 1997

Decided: August 4, 1998

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

**¶1 Plaintiffs Russell Edward Dorwart (Dorwart) and Harry Dorwart appeal from the judgment entered by the Thirteenth Judicial District Court, Stillwater County, on its order granting partial summary judgment to defendants Paul Caraway, Danny Ames, Cliff Brophy and Stillwater County. The defendants cross-appeal from the**

judgment entered by the District Court on its order granting partial summary judgment to Dorwart. We affirm in part, reverse in part and remand for further proceedings.

¶2 We address the following dispositive issues on appeal and cross-appeal:

¶3 1. Did the District Court err in determining that the actions of the Sheriff's deputies in entering Dorwart's residence and levying upon personal property therein did not violate Dorwart's constitutional rights to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution or his right to privacy under Article II, Section 10 of the Montana Constitution?

¶4 2. Did the District Court err in determining that Montana's post-judgment execution statutes are unconstitutional because they do not provide the procedural due process of law required by Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment to the United States Constitution?

¶5 3. Are the Sheriff's deputies entitled to qualified immunity from individual liability for Dorwart's 42 U.S.C. § 1983 claims?

¶6 4. Did the District Court err in granting summary judgment in favor of Stillwater County and Cliff Brophy, in his capacity as Sheriff, on Dorwart's 42 U.S.C. § 1983 search and seizure claim?

¶7 5. Did the District Court err in granting summary judgment in favor of the defendants on Dorwart's conversion and trespass claims and Harry Dorwart's trespass claim?

¶8 6. Did the District Court err in concluding that Dorwart is not entitled to attorney's fees?

## BACKGROUND

¶9 Dorwart was the named defendant in two actions in the Small Claims Division of the Justice Court in Stillwater County, Montana. Default judgments were entered against him in those actions on February 19 and March 11, 1991. The Justice Court subsequently issued writs of execution to enforce the judgments on March 12 and

April 9, 1991, respectively.

¶10 On the evening of April 11, 1991, Dorwart was driving his pickup truck along Highway 78 between Columbus and Absarokee when he was stopped by Deputy Sheriff Danny Ames (Ames) and served with the two writs of execution. Ames also arrested Dorwart for driving under the influence of alcohol, seized the pickup truck and transported Dorwart to the Stillwater County Jail (Jail). After Dorwart was incarcerated in the Jail, either Ames or Deputy Sheriff Paul Caraway (Caraway) asked Dorwart whether the door to his residence was locked and Dorwart responded that one door was not locked. He also told the deputies that his wallet and driver's license were on the dashboard of his mother's car, which was parked in his driveway.

¶11 Ames and Caraway proceeded to Dorwart's residence, entered the house and the garage, and seized various items of personal property pursuant to the writs of execution. They also took Dorwart's wallet from the dashboard of the car. Neither Ames nor Caraway had requested permission from Dorwart to enter his residence.

¶12 Dorwart's pickup truck, its contents and his wallet were returned to him several days later. On April 18, 1991, Dorwart filed in Justice Court a Motion for Release of Property and to Quash the Writs of Execution, supported by an Affidavit of Exemption and other affidavits, asserting that the personal property which Ames and Caraway had seized from his house and garage either was exempt from execution or did not belong to him. The record does not indicate whether the Justice Court held a hearing on Dorwart's motion but, on September 30, 1991, it ordered that all of the property seized from Dorwart's house and garage be returned to its rightful owners. Dorwart subsequently retrieved the property from the Jail.

¶13 On April 5, 1993, Dorwart filed a complaint against Caraway, Ames, Sheriff Cliff Brophy (Brophy) and Stillwater County (collectively, the County). The complaint asserted various state and federal claims, as well as several common law tort claims, resulting from the seizure of his property and requested monetary damages. Dorwart later amended the complaint to add a claim for declaratory and injunctive relief based on his contention that Montana's post-judgment execution statutes are unconstitutional. Harry Dorwart, Dorwart's father and the owner of Dorwart's residence, asserted a trespass claim against Caraway and Ames.

¶14 The County moved for summary judgment on all claims against all defendants

and Dorwart moved for partial summary judgment on all but two of his claims. The District Court granted Dorwart's motion for summary judgment on his claim for declaratory and injunctive relief, granted the County's motion for summary judgment on the remainder of Dorwart's claims and entered judgment accordingly. Dorwart appeals and the County cross-appeals.

## STANDARD OF REVIEW

¶15 Our standard in reviewing a district court's summary judgment ruling is *de novo*; we use the same Rule 56, M.R.Civ.P., criteria as the district court. Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 283, 927 P.2d 995, 997 (citations omitted). A party seeking summary judgment must establish the absence of any genuine issue of material fact which would allow the nonmoving party to recover and entitlement to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Clark, 279 Mont. at 283, 927 P.2d at 997-98 (citations omitted).

¶16 Ordinarily, we begin our review in a summary judgment case by determining whether the moving party established the absence of disputed and material fact issues. See Montana Metal Buildings, Inc. v. Shapiro (1997), 283 Mont. 471, 475, 942 P.2d 694, 696-97. Here, however, the material facts are undisputed and the parties' assertions of error relate only to the District Court's conclusions of law regarding entitlement to summary judgment. We review a district court's conclusions of law to determine whether those conclusions are correct. Albright v. State, by and through State (1997), 281 Mont. 196, 205, 933 P.2d 815, 821 (citation omitted).

## DISCUSSION

¶17 1. Did the District Court err in determining that the actions of the Sheriff's deputies in entering Dorwart's residence and levying upon personal property therein did not violate Dorwart's constitutional rights to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution or his right to privacy under Article II, Section 10 of the Montana Constitution?

¶18 The District Court concluded that Ames and Caraway did not violate Dorwart's constitutional rights when they entered his home and levied upon property therein because the writs of execution constituted judicial authorization for their actions.

Dorwart contends that this conclusion is erroneous, arguing that the writs, in and of themselves, were insufficient to justify intrusion into his home without a search warrant. As a result, according to Dorwart, the deputies' entry into his home and subsequent levy on his property violated his constitutional rights to be free from unreasonable searches and seizures and his right to privacy. We address Dorwart's separate search and seizure and privacy arguments in turn.

¶19 Dorwart's complaint stated two search and seizure-related claims against Caraway and Ames. The first was brought pursuant to 42 U.S.C. § 1983 (§ 1983), which authorizes a cause of action when a person has been deprived of a federally protected right by another person acting under color of state law. See 42 U.S.C. § 1983; Mysse v. Martens (1996), 279 Mont. 253, 260, 926 P.2d 765, 769. This search and seizure-related claim alleged that Caraway and Ames violated Dorwart's rights under the Fourth Amendment to the United States Constitution. The second claim alleged that the deputies' entry into Dorwart's home and seizure of his personal property violated his state constitutional rights as guaranteed by Article II, Section 11 of the Montana Constitution. The County moved for summary judgment on both causes of action, contending that the deputies' actions neither deprived Dorwart of a federally protected right that would give rise to a § 1983 claim nor violated Article II, Section 11 of the Montana Constitution.

¶20 The District Court granted the County's motion, concluding that Caraway and Ames did not violate Dorwart's federal or state constitutional rights when they entered his home and levied upon personal property therein because the writs of execution constituted judicial authorization for their actions. Dorwart argues that the writs, in and of themselves, were insufficient to justify intrusion into his home and, as a result, that the entry into his home and levy on his property violated his constitutional rights to be free from unreasonable searches and seizures.

¶21 The Fourth Amendment to the United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article II, Section 11 of the Montana Constitution mirrors the Fourth Amendment to the United States Constitution and, as a result, we analyze most search and seizure questions arising under Article II, Section 11 using traditional Fourth Amendment principles. State v. Siegal (1997), 281 Mont. 250, 264, 934 P.2d 176, 184. The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to protect the privacy and security of individuals and safeguard the sanctity of the home against arbitrary invasions by government officials. Camara v. Municipal Court (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935; State v. Gray (1968), 152 Mont. 145, 149, 447 P.2d 475, 477. In effectuating that underlying purpose, the key principle followed by courts is that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." Camara, 387 U.S. at 528-29 (citations omitted).

¶22 The specific issue before us is whether an officer's entry into a private residence for the purpose of executing a writ of execution violates constitutional rights against unreasonable searches and seizures where the only authorization for the officer's entry into the residence is the writ of execution itself. The County contends that this issue has been addressed in, and is controlled by, Ramsey v. Burns (1902), 27 Mont. 154, 69 P. 711. It relies on Ramsey for the proposition that one of the implied powers authorized by a writ of execution includes the levying officer's right to enter a judgment debtor's residence or place of business in order to execute the writ and, on that basis, contends that the deputies' search of Dorwart's home and seizure of property were not unreasonable because the writs of execution themselves authorized entry into his home. The County's reliance on Ramsey is misplaced.

¶23 In Ramsey, a special officer, appointed by a justice of the peace and acting pursuant to a pre-judgment writ of attachment, levied upon personal property belonging to a business owned by Ramsey. In executing the writ, the officer entered the business premises, locked the doors and remained in possession of both the premises and the personal property within for five days, releasing the property only when learning it had been mortgaged to another. Ramsey, 27 Mont. at 155, 69 P. at 712. Ramsey prevailed in a suit against the officer, the justice of the peace who issued the writ and the sureties of the justice of the peace for damages resulting from destruction of property, false imprisonment and interruption of her business and the defendants appealed. Ramsey, 27 Mont. at 155-56, 69 P. at 712. In addressing the defendants' contention that the trial court erred in instructing the jury that an officer was not authorized to take possession of premises where property to be seized

**is located, this Court stated:**

> An officer has the right to enter a business place against the will of the occupant, permission having been asked and refused, and to seize the property therein belonging to the occupant and subject to levy. It is impossible to make such levy in many cases, as where a whole stock of goods is seized, without taking possession of the place where the goods are. . . . The officer has a right to enter and have possession of the place, as above stated, for a reasonable time, and he may have there the goods in storage for such reasonable time as he may require to pack them and to procure the necessary transportation for their removal.

Ramsey, 27 Mont. at 156-57, 69 P. at 712. On that basis, we concluded the jury instruction erroneously stated the law. Ramsey, 27 Mont. at 157, 69 P. at 712.

**¶24 Ramsey is readily distinguishable. Factual distinctions aside, no constitutional search and seizure issue relating to execution of a writ was raised or addressed in Ramsey. Thus, Ramsey has no application here.**

**¶25 Whether an officer's entry into a private residence to execute on a writ violates search and seizure rights, where the only authorization for the entry is the writ of execution itself, is an issue of first impression in Montana. The threshold question in analyzing search and seizure issues is whether the person asserting an invasion of these constitutional rights has a legitimate expectation of privacy in the area invaded. State v. McCarthy (1993), 258 Mont. 51, 55, 852 P.2d 111, 113. We have long recognized that a person has a legitimate expectation of privacy in his or her own home. See, e.g., State v. Carlson (1982), 198 Mont. 113, 126, 644 P.2d 498, 505. Thus, Dorwart had a legitimate expectation of privacy in his home and, indeed, the County does not appear to argue otherwise.**

**¶26 Once a legitimate expectation of privacy has been established, any governmental intrusion into Dorwart's home conducted without a search warrant is *per se* unreasonable under the Montana and United States Constitutions subject to only a few well-established exceptions. See State v. Loh (1996), 275 Mont. 460, 468, 914 P.2d 592, 597 (citing Katz v. United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585). These well-established exceptions to the search warrant requirement include voluntary and knowing consent to a search (State v. Rushton**

(1994), 264 Mont. 248, 257-58, 870 P.2d 1355, 1361) and exigent circumstances (State v. Dawson (1988), 233 Mont. 345, 353, 761 P.2d 352, 357).

¶27 Here, it is undisputed that Ames and Caraway did not have a search warrant authorizing their entry into Dorwart's home. It is also undisputed that Dorwart did not consent to the deputies' entry into his home. Furthermore, the circumstances of this case do not fit within the framework of the exigent circumstances exception or any other established exceptions to the search warrant requirement and the County does not argue that any of these exceptions exist in this case. Thus, these established exceptions to the search warrant requirement are not satisfied here and, as a result, it appears that the deputies' search of Dorwart's home and seizure of his property were constitutionally unreasonable. See Loh, 275 Mont. at 468, 914 P.2d at 597.

¶28 The County contends, however, that it is well-established that a writ of execution, in and of itself, authorizes officers to enter private residences to levy on personal property therein. It cites to several cases in support of this proposition, but the cases are distinguishable.

¶29 The County first relies on People v. Sylva (Cal. 1904), 76 P. 814, in which the California Supreme Court stated that "[a]n officer charged with the duty of enforcing a judgment by execution has the right to enter the premises of the execution defendant if he can do so peaceably." Sylva, 76 P. at 815. In Sylva, an attorney and a deputy sheriff entered the defendant's home to levy on property pursuant to a writ of execution; the defendant pointed a gun at the two and ordered them to leave the premises. The defendant was convicted of assault with a deadly weapon and argued on appeal that the attorney and deputy were trespassers, thus giving him the right to use all force necessary to expel them from his property. The California court concluded that the writ of execution authorized the deputy to both peaceably enter the defendant's home and bring the attorney as an assistant and, therefore, the two were not trespassers. Thus, the defendant's justifiable use of force defense failed as a matter of law. Sylva, 76 P. at 815. As in Ramsey, however, no constitutional search and seizure issue relating to writs of execution was raised or discussed in Sylva, and, as a result, that case has no application here.

¶30 The County also relies on Gumz v. Morrissette (7th Cir. 1985), 772 F.2d 1395, for the proposition that the issuance of a writ of execution by a court after entry of a judgment authorizes the seizure of a civil defendant's property. In Gumz, Wisconsin

officials arrested the plaintiff and seized his dragline equipment based on their determination that the plaintiff had been dredging a waterway without a permit in violation of state civil statutes. The plaintiff brought an action against the officials in the federal district court asserting, in part, a § 1983 claim based on allegations that they violated his rights under the Fourteenth Amendment by seizing his property without affording him due process of law. Gumz, 772 F.2d at 1398. A jury rendered a verdict in favor of the defendants on this due process claim and the district court subsequently denied the plaintiff's motion to amend the verdict. Gumz, 772 F.2d at 1399. The plaintiff appealed, arguing that the trial court erred in determining that, if defendants established probable cause for their belief that the dragline was being used for illegal dredging, the seizure of the dragline would not violate due process constraints. Gumz, 772 F.2d at 1402.

¶31 The Seventh Circuit Court of Appeals concluded that the civil statutes at issue did not authorize the seizure of property without a prior forfeiture action, stating that "[s]eizure of a civil defendant's property would only be permissible after entry of judgment and issuance of a writ of execution by the court." Gumz, 772 F.2d at 1403. This statement, however, clearly was directed only to Fourteenth Amendment due process requirements necessary before state officials could deprive someone of property pursuant to the civil statutes at issue. Indeed, the Seventh Circuit expressly did not address any Fourth Amendment search and seizure issues in Gumz because the plaintiff had waived those issues in the court below. Gumz, 772 F.2d at 1399, n.3. Furthermore, the quoted statement relates only to authorization of a seizure of property; the court made no reference to whether the issuance of a writ of execution would authorize the entry onto private property to conduct a search for property. For these reasons, Gumz is inapplicable here.

¶32 The County next cites to City of Costa Mesa v. Soffer (Cal. App. 1992), 13 Cal. Rptr.2d 735. In Soffer, the California Court of Appeals determined that entry into private property by city officials for inspection of an alleged nuisance, pursuant to judicial authorization, did not contravene the Fourth Amendment proscription against unreasonable searches and seizures. Soffer, 13 Cal.Rptr.2d at 741. The County asserts that the writs of execution in the present case constitute the same type of "judicial authorization" discussed by the California court in Soffer and, therefore, Soffer supports its argument that the writs of execution authorized the deputies' entry into Dorwart's home. We disagree.

¶33 In Soffer, the "judicial authorization" was a court order specifically directing the city officials to go onto the defendant's property to inspect the alleged nuisance. Soffer, 13 Cal.Rptr.2d at 736. Here, neither the writs of execution themselves, nor the post-judgment execution statutes pursuant to which the writs were issued, expressly directed or authorized the deputies to enter Dorwart's private residence to effectuate the seizure of his property. Thus, Soffer is distinguishable on its facts from the present case and is of no assistance to the County.

¶34 Finally, the County cites to Boyd v. United States (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, specifically relying on the United States Supreme Court's statement therein that

> [t]he entry upon premises, made by a sheriff or other officer of the law, for the purpose of seizing goods and chattels by virtue of a judicial writ, such as an attachment, a sequestration, or an execution, is not within the prohibition of the Fourth . . . Amendment . . . .

Boyd, 116 U.S. at 624. The County urges that, since Boyd has never been overruled, it constitutes controlling authority that writs of execution authorize officers to enter private residences to levy upon property therein without the necessity of a search warrant and without violating Fourth Amendment search and seizure principles. Again, we disagree.

¶35 First, the Supreme Court itself considers the above-quoted language from Boyd to be dicta, and has refused to conclude that the Boyd language required a holding that the Fourth Amendment warrant requirements did not apply to searches of private premises for the purpose of collecting assessed tax deficiencies. See G.M. Leasing Corp. v. United States (1977), 429 U.S. 338, 355-56, 97 S.Ct. 619, 630, 50 L. Ed.2d 530, 545-46. In this regard, we previously have determined that we need not regard dicta in Supreme Court cases as controlling the outcome of issues before us. See Commonwealth Edison Co. v. State (1980), 189 Mont. 191, 200, 615 P.2d 847, 852.

¶36 Further, the Supreme Court's statement in Boyd was premised on its determination that the Fourth Amendment prohibition against unreasonable searches and seizures does not apply in civil contexts such as executing a writ of execution because the underlying purpose of the search is to locate and seize property to which the creditor is entitled in satisfaction of a debt and not to discover evidence to support criminal charges against the owner of the premises. See Boyd,

116 U.S. at 624. However, the Supreme Court subsequently has reevaluated its earlier cases which concluded that an administrative search touches only the periphery of the interests protected by the Fourth Amendment because it does not seek evidence of criminal activity and, thus, that such a search involves only the less intense "right to be secure from intrusion into personal privacy" rather than the greater "self-protection" interests under the Fourth and Fifth Amendments. See Camara, 387 U.S. at 530 (citing Frank v. State of Maryland (1959), 364 U.S. 360, 79 S. Ct. 804, 3 L.Ed.2d 877; Boyd, 116 U.S. 616). Rather, the Supreme Court determined in Camara that "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior . . ." because all citizens, law-abiding or not, have a strong interest in limiting the circumstances in which the sanctity of the private home may be invaded by official authority. Camara, 387 U.S. at 530-31.

¶37 We turn, then, to the issue of first impression in Montana which this case presents: whether an officer's entry into a private residence to execute on a writ of execution violates constitutional rights against unreasonable searches and seizures where the only authorization for the entry is the writ of execution itself. The issue includes two subissues: whether an entry into a residence to execute a writ of execution is subject to constitutional search and seizure provisions and, if so, whether the writ of execution satisfies, or is an exception to, the warrant requirement contained in those provisions. We address these subissues in turn, beginning with a closer review of the guidance provided by Camara and G.M. Leasing with regard to the interface between civil administrative searches and modern constitutional search and seizure principles.

¶38 In Camara, the Supreme Court addressed whether an administrative search of a citizen's residence to inspect for housing code violations violated Fourth Amendment rights when conducted without a search warrant. Camara, 387 U.S. at 534. There, the city housing code at issue gave authorized city inspectors "the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them . . . ." Camara, 387 U.S. at 526. When Camara refused to allow a city inspector into his home without a search warrant, the city filed a criminal complaint. Camara, 387 U.S. at 527. Camara contended that the housing code provision violated the Fourth and Fourteenth Amendments because it allowed city officials to enter a private home without a search warrant and without probable cause to believe that a violation of the housing code existed therein. Camara, 387 U.S.

**at 527.**

**¶39 The Supreme Court first concluded, as discussed above, that the Fourth Amendment prohibition against unreasonable searches and seizures applies in civil, as well as criminal, contexts because all citizens have a strong interest in securing their homes from intrusion by officials regardless of the reason for the intrusion. Camara, 387 U.S. at 530-31. The Supreme Court was concerned that, when an inspector requests entry for an inspection, the occupant of the home has no knowledge of whether enforcement of the code actually requires entry into that home, whether the inspector is acting under proper authority, or the lawful limits of the inspector's power to search. These are matters which, under other circumstances, normally are addressed by a neutral magistrate in reviewing search warrant applications. Thus,**

> [t]he practical effect of this system is to leave the occupant subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search. . . . We simply cannot say that the protections provided by the warrant procedure are not needed in this context . . . .

Camara, 387 U.S. at 532-33. For these reasons, the Supreme Court determined that administrative searches such as the housing code inspection were significant intrusions on interests protected by the Fourth Amendment and were subject to the warrant requirement. Camara, 387 U.S. at 534.

**¶40 Similarly, in G.M. Leasing, the Supreme Court concluded that, in levying upon property to satisfy tax deficiencies, the government was not exempt from the Fourth Amendment stricture that a search of private property is unreasonable unless authorized by a valid search warrant. G.M. Leasing, 429 U.S. at 358. In that regard, the Supreme Court determined that the government's tax assessment, while authorizing all types of property seizures in general, did not authorize all types of warrantless intrusions into privacy to effect those seizures. G.M. Leasing, 429 U.S. at 358. Thus, the internal revenue agents' entry into G.M. Leasing's business premises, without a warrant, to levy on property therein violated G.M. Leasing's rights under the Fourth Amendment. G.M. Leasing, 429 U.S. at 359.**

¶41 In both <u>Camara</u> and <u>G.M. Leasing</u>, the Supreme Court's primary concern was that, absent a judicially authorized search warrant issued after a showing of probable cause to search, there is no limitation on the discretion of the officer conducting such an administrative search of a private home or business. Placing such limitations on the discretion of when, where and how to conduct a search which intrudes upon a private area is the precise reason behind the Fourth Amendment's search warrant requirement. <u>Camara</u>, 387 U.S. at 534.

¶42 This Court also has long recognized that the protection against unreasonable searches and seizures provision in Montana's Constitution applies to all people and their homes and effects, without regard to whether criminal conduct is involved. <u>See</u> State ex rel. King v. District Court (1924), 70 Mont. 191, 196-97, 224 P. 862, 864 (discussing Article III, Section 7 of the 1889 Montana Constitution, which is identical to Article II, Section 11 of the 1972 Montana Constitution). On these bases, we conclude that an officer's entry into a private home to execute a writ of execution is subject to the search and seizure provisions of the Montana and United States Constitutions. The question remains, however, whether a writ of execution is an exception to, or satisfies, the warrant requirement of these constitutional provisions.

¶43 In the analogous administrative inspection context addressed in <u>Camara</u>, the Supreme Court rejected the notion that an administrative search constituted an exception to the Fourth Amendment's warrant requirement. It determined that, to adequately protect a person's Fourth Amendment rights, there must be a showing of "probable cause" to conduct an administrative inspection. <u>Camara</u>, 387 U.S. at 534. In the administrative inspection arena, the probable cause requirement entails a determination, after weighing the need for the inspection in terms of the reasonable goal to be achieved thereby against the resulting intrusion, that the particular inspection is reasonable under the circumstances. <u>Camara</u> 387 U.S. at 534-35.

> The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant.

<u>Camara</u>, 387 U.S. at 539.

¶44 More directly on point is Nebraska v. Hinchey (Neb. 1985), 374 N.W.2d 14. There, a sheriff's deputy went to Hinchey's home to serve and execute a writ of execution. Although Hinchey refused several times to allow the deputy inside, he finally agreed, but asked the deputy to wait outside a moment while he "put something away." The deputy, however, immediately followed Hinchey inside the apartment and observed a jar of what appeared to be marijuana. Hinchey subsequently was arrested for possession of marijuana and drug paraphernalia. Hinchey, 374 N.W.2d at 16. Hinchey moved to suppress the evidence, arguing that the deputy had violated his Fourth Amendment rights. The trial court denied the motion, Hinchey was convicted and, thereafter, he appealed the denial of his motion to suppress. Hinchey, 374 N.W.2d at 16-17.

¶45 On appeal, Hinchey argued that his Fourth Amendment rights were violated by the deputy's entry into his apartment without a search warrant. The prosecution responded that, once the deputy was inside the premises and saw the marijuana, he was authorized to seize it under the "plain view doctrine." Thus, the question before the Nebraska Supreme Court was whether the deputy was legally authorized to enter Hinchey's apartment without a warrant prior to viewing the jar of marijuana. The prosecution argued that, because the execution statutes required the deputy to seek property which could be levied upon, the writ of execution issued pursuant to those statutes provided the deputy with lawful authority to enter the apartment without a warrant. Hinchey, 374 N.W.2d at 18.

¶46 The Nebraska court observed at the outset that the statute requiring an officer to seek property on which a levy could be made could not supersede constitutional prohibitions against unreasonable searches and seizures. It determined that, while the Nebraska execution statute authorized the general "seizure" of Hinchey's property, it did not authorize a warrantless "search" for that property when such a search violated the debtor's Fourth Amendment rights. Hinchey, 374 N.W.2d at 18-19. The court further concluded that the writ of execution itself did not constitute judicial authorization, as contemplated by the Fourth Amendment's warrant requirement, because issuance of the writ was purely ministerial and did not require any action or review by a court; to obtain a writ, a judgment creditor needed only to file a praecipe with the clerk of court. Hinchey, 374 N.W.2d at 19. Indeed, the writ was issued

without any showing upon which it may be found that property cannot

otherwise be obtained without violating the debtor's fourth amendment right against unreasonable searches and seizures. That is why arming a sheriff or one of his deputies with a writ of execution is not the same as employing judicial process of a type required for one to obtain a search warrant or an arrest warrant. We see little reason to distinguish between the requirements which must be met before property or persons may be seized for criminal purposes and before property or persons may be seized for civil purposes. Likewise, the fourth amendment does not recognize such a distinction.

Hinchey, 374 N.W.2d at 19. As a result of these conclusions, the Hinchey court held that, absent exigent circumstances, an officer may not enter a private home to levy upon property therein without first obtaining an "execution warrant." Hinchey, 374 N.W.2d at 20. Thus, the officer's entry into Hinchey's home pursuant to the writ of execution did not constitute an exception to the Fourth Amendment warrant requirement and the writ itself did not rise to the level of a search warrant authorizing the search.

**¶47 In the present case, it is undisputed that Caraway and Ames did not obtain a search warrant authorizing them to enter Dorwart's home. In arguing that a warrant was not required under the circumstances, the County points out that the writs of execution in this case were issued and acted upon in conformity with Montana's post-judgment execution statutes. This is, of course, similar to the argument made in Hinchey and rejected on the basis that a statute cannot supersede the Fourth Amendment prohibition against unreasonable searches and seizures. See Hinchey, 374 N.W.2d at 18. The mere fact that the issuance of the writs, and the deputies' conduct pursuant to those writs, did not violate applicable statutes does not establish that the statutory procedures adequately protect the constitutional rights of either Dorwart or other judgment debtors under similar circumstances. See, e.g., Duran v. Buttrey Food, Inc. (1980), 189 Mont. 381, 392, 616 P.2d 327, 333. "To accept that rationale would be to surrender this Court's power to determine the constitutionality of enactments of the legislature." Duran, 189 Mont. at 392, 616 P.2d at 333.**

**¶48 Moreover, nothing in the post-judgment execution statutes expressly authorizes the entry into a private home for the purposes of executing a writ of execution. While the execution statutes authorize the levy on--or "seizure" of--a judgment debtor's personal property pursuant to a writ of execution, they do not authorize officials to enter private homes to search for that property. See, e.g §§ 25-13-304, 25-13-306, 25-13-307, 25-13-402, MCA.**

¶49 The County also contends that the writs were judicially approved by the Stillwater County Justice of the Peace, thus fulfilling the "neutral magistrate" purpose served by the constitutional search warrant requirement. We disagree. The writs of execution here cannot be said to have been "judicially approved" in a manner which fulfilled the purpose served by--or the requirements for--a search warrant.

¶50 Review of a search warrant application by an impartial magistrate ensures that a neutral and detached evaluation of the situation is interposed between the investigating officers and the private citizen. State v. Wilson (1994), 266 Mont. 146, 149, 879 P.2d 683, 684. As a result, Montana law requires that a judge or magistrate evaluate a search warrant application and make an objective determination as to whether an intrusion into a private home is reasonable and justified under the circumstances. Wilson, 266 Mont. at 149, 879 P.2d at 684. A judge may issue a search warrant only upon written application, made under oath or affirmation, which states sufficient probable cause for authorizing the search. Art. II, Sec. 11, Mont. Const.; U. S. Const. amend. IV; § 46-5-221, MCA. Moreover, a search warrant must particularly describe the person or place to be searched and the items to be seized. Art. II, Sec. 11, Mont. Const.; U.S.Const. amend. IV; § 46-5-221, MCA.

¶51 Here, it is true that the writs of execution were signed by the Stillwater County Justice of the Peace. Indeed, Rule 23(C), M.J.C.C.R.Civ.P., requires that a writ of execution to enforce a justice court judgment be signed by a justice of the peace. However, neither the justice court civil procedure rules nor the post-judgment execution statutes require any substantive impartial review by a court regarding whether a writ of execution should be issued. Nor does the record reflect any applications for the writs at issue here based on affidavit or other testimony describing the place to be searched, the property sought and the necessity of the search. Likewise, the record is devoid of any indication that the Justice of the Peace made an objective determination that there was probable or reasonable cause to believe the search of Dorwart's home was justified under the circumstances. Finally, the writs themselves do not constitute a suitably restricted search warrant because they fail to delineate the property sought or the place to be searched with any specificity.

¶52 The procedures used here, and the writs of execution issued thereunder, simply did not sufficiently limit the deputies' discretion in executing the writs to satisfy the

search and seizure provisions of the Fourth Amendment to the United States Constitution or Article II, Section 11 of the Montana Constitution. We conclude, therefore, that the writs of execution were not adequate--in and of themselves--to authorize the deputies' entry into Dorwart's home and that Ames' and Caraway's entry into Dorwart's home and seizure of his personal property, without his consent and without benefit of a warrant, violated Dorwart's rights under these constitutional provisions. As a result, we hold that the District Court erred in determining that the actions of Caraway and Ames in entering Dorwart's residence and levying upon personal property therein did not violate Dorwart's right to be free from unreasonable searches and seizures.

¶53 Having concluded that writs of execution do not authorize the entry into and search of a private home, the question arises as to how lawful authority to enter and search a home to execute a writ of execution can be obtained. Again, we look to Hinchey for guidance.

¶54 The Hinchey court observed, first, that an officer still has a duty to seek and take possession of property which can be obtained without violating the owner's Fourth Amendment rights. Hinchey, 374 N.W.2d at 20. When the officer has been unable to secure such property as would satisfy the underlying judgment, however, and there is reason to believe that personal property subject to execution may be located within the debtor's residence, an "execution warrant" should be obtained pursuant to the following procedures:

> Such an execution warrant should be issued only by a judge . . . upon reasonable cause supported by affidavit setting out that a writ of execution has been issued and returned unsatisfied in whole or in part and that the affiant has reason to believe that there is property subject to execution in the possession of the debtor kept and maintained within the debtor's residence, not otherwise available for execution, describing the property sought and the place and purpose of the execution. If the judge is satisfied that there is reasonable cause to believe that there is property of the debtor within the debtor's possession and that other property is not available for levy and execution, the judge may then issue an execution warrant authorizing the officer to enter the premises and levy upon property subject to execution. In this manner the fourth amendment prohibition against unreasonable searches and seizures will be satisfied.

<u>Hinchey</u>, 374 N.W.2d at 20. We agree with, and adopt, the execution warrant requirement and procedures set forth in <u>Hinchey</u> for those situations where insufficient property has been obtained pursuant to the writ of execution. We conclude that such an execution warrant, obtained under the procedures set forth above, will protect judgment debtors' rights to be free from unreasonable searches and seizures under both the Montana and United States Constitutions.

¶55 The District Court also granted summary judgment to the County on Dorwart's claim that the actions of Caraway and Ames violated his right to privacy as guaranteed by the Montana Constitution. In this regard, the court concluded that the deputies' actions were reasonable, within the scope of the law and justified by the writs of execution. Thus, the court further concluded that, because no unreasonable search took place, Dorwart's privacy claim failed as a matter of law. Dorwart argues that the District Court's conclusions are erroneous and that there is no compelling state interest which justified the nonconsensual, warrantless entry into his home.

¶56 Article II, Section 10 of the Montana Constitution provides as follows:

> The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

We previously have held that an official action which constitutes a "search" as that term is defined, and which is conducted without benefit of a search warrant, implicates Article II, Section 10 of Montana's Constitution and must be justified by the demonstration of a compelling state interest. <u>See</u> <u>Siegal</u>, 281 Mont. at 257, 934 P.2d at 192. Moreover, any compelling state interest justifying such an intrusion on a person's privacy must be closely tailored to effectuate only that compelling interest. State v. Pastos (1994), 269 Mont. 43, 47, 887 P.2d 199, 202 (citing Zablocki v. Redhail (1978), 434 U.S. 374, 388, 98 S.Ct. 673, 682,

54 L.Ed.2d 618, 631). Thus, as it is clear that there was a warrantless search of Dorwart's home, there also must be a concomitant compelling state interest justifying that search in order to avoid violating Dorwart's right to privacy under the Montana Constitution.

¶57 We held above that the deputies' actions of entering Dorwart's home and seizing his personal property therein constituted an unreasonable search and seizure. As a result, the District Court's conclusion that no violation of Dorwart's constitutional

privacy rights occurred, to the extent it is based on the erroneous determination that the search was reasonable, also is erroneous. Thus, we address the arguments presented regarding whether a compelling state interest justified the intrusion into Dorwart's home.

¶58 The County does not specifically assert the existence of a compelling state interest justifying the intrusion into Dorwart's home by Caraway and Ames, but rather focuses on the fact that the writs of execution were issued by the Stillwater County Justice Court in conformity with the statutes governing post-judgment execution procedures. On that basis, it argues that no violation of privacy rights occurred because the writs gave the deputies legal authority to enter Dorwart's home. We have resolved this argument against the County above and need not address it further here.

¶59 The Attorney General of the State of Montana (State), appearing as amicus curiae, argues that the compelling state interest here is the enforcement of monetary judgments by the seizure of a judgment debtor's property and the preservation of the credibility of the judicial system. We previously have recognized that a compelling state interest justifying an intrusion into a person's privacy may exist where the state is acting to enforce its criminal laws for the benefit and protection of other fundamental rights of its citizens. See, e.g., Siegal, 281 Mont. at 263, 934 P.2d at 184; State v. Solis (1984), 214 Mont. 310, 319, 693 P.2d 518, 522. In the present case, however, the entry into Dorwart's home was not undertaken to enforce the state's criminal laws nor was it for the purpose of protecting society in general from the actions of criminal wrongdoers. The entry was effectuated for the purpose of enforcing a civil judgment between two private citizens. While we agree that the state has an interest in preserving the integrity of our judicial system and the enforceability of judgments, this interest is not so "compelling" as to justify an intrusion into a person's private home, without his or her consent, for the purposes of searching through that home and seizing any and all items of property which might have some value.

¶60 Neither the County nor the State presents additional argument as to the existence of a compelling state interest, closely tailored to effectuate only that interest, which justified the warrantless entry into Dorwart's home and we conclude that no such compelling interest exists. As a result, we hold that the District Court erred in concluding that the actions of Caraway and Ames in entering Dorwart's

residence and levying upon personal property therein did not violate Dorwart's right to privacy under Article II, Section 10 of the Montana Constitution.

¶61 Because the District Court erroneously concluded that Dorwart's right to be free from unreasonable searches and seizures and right to privacy were not violated by the deputies' actions in this case and granted summary judgment to the County on that basis, further consideration by the trial court of Dorwart's search and seizure and right to privacy claims under the state constitution was prematurely terminated. In light of our holdings that the District Court erred in granting summary judgment on Dorwart's claims under Article II, Sections 10 and 11 of the Montana Constitution, we remand for further proceedings on those state constitutional claims.

¶62 2. Did the District Court err in determining that Montana's post-judgment execution statutes are unconstitutional because they do not provide the procedural due process of law required by Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment to the United States Constitution?

¶63 Montana's post-judgment execution statutes are located in Title 25, Chapter 13 of the Montana Code Annotated (MCA). Pursuant to those statutes, a party who receives a judgment for money or the possession of property may have a writ of execution issued to enforce that judgment. See §§ 25-13-101(1) and 25-13-201, MCA. A writ of execution issued against the property of the judgment debtor must be satisfied through the levy on and sale of the judgment debtor's personal or, if necessary, real property. See §§ 25-13-304 and 25-13-402, MCA. All property of the judgment debtor not specifically exempt by law is subject to execution (§ 25-13-501, MCA) and property exempt from execution is set forth in Title 25, Chapter 13, Part 6 of the MCA.

¶64 In creating the statutory exemptions from execution, the Montana Legislature provided that some types of property are completely exempt from execution, while other types of property are exempt from execution only up to a certain monetary amount. For example, § 25-13-608, MCA, provides that judgment debtors are entitled to exemption from execution of the property and benefits enumerated thereunder without limitation as to the monetary value of the property or benefit. In contrast, § 25-13-609, MCA, provides that judgment debtors are entitled to exemption from execution of the debtor's interest, not exceeding designated monetary values, in various specified items of personal property. In this case,

Dorwart claimed that the deputies levied on personal property which was exempt under § 25-13-609, MCA.

¶65 Dorwart's complaint sought a declaratory judgment and injunctive relief on the basis that Montana's post-judgment execution statutes violate his rights to due process of law under the Montana and United States Constitutions. He asserted that he has a property interest in the statutory exemptions from execution provided to judgment debtors and that the statutory execution procedures are constitutionally inadequate because they allowed the County to deprive him of his property interest in the exemptions from execution without due process of law.

¶66 The District Court granted Dorwart's motion for summary judgment on this claim, determining that the due process provided by the execution statutes is constitutionally deficient. The County contends that the District Court erred, arguing that Dorwart has no constitutionally protected property interest in asserting a statutory personal property exemption and, absent such a property interest, there can be no due process violation. The County also argues that, even if Dorwart has a protected property interest, Montana's post-judgment execution statutes provide adequate due process. We address these arguments in turn.

### A. Property interest in statutory exemptions

¶67 The Montana Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." Art. II, Sec. 17, Mont. Const. Similarly, the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ."

¶68 In determining whether constitutional due process protections have been violated in a given case, we first address whether a property or liberty interest exists which rises to a level accorded due process protection under the United States and Montana Constitutions. Akhtar v. Van De Wetering (1982), 197 Mont. 205, 210, 642 P.2d 149, 152. In order to establish a property interest in a benefit such as the personal property exemptions at issue here, a person must show that he or she has a legitimate claim of entitlement to the benefit. Akhtar, 197 Mont. at 211, 642 P.2d at 153 (citing Board of Regents v. Roth (1972), 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561). The source of such an entitlement to a benefit may be found in

state law. Akhtar, 197 Mont. at 211, 642 P.2d at 153 (citing Roth, 408 U.S. at 577). Therefore, in determining whether Dorwart has a legitimate claim of entitlement to statutory exemptions from execution which creates a constitutionally protected property right, we look first to the statutes establishing the property exemptions available to a judgment debtor in Montana.

¶69 Section 25-13-606, MCA, expressly provides that a resident of Montana is "entitled" to the statutory exemptions from execution. Sections 25-13-608 and 25-13-609, MCA, also provide that judgment debtors are "entitled" to the specific exemptions from execution enumerated therein. Moreover, "entitle" is defined as "to give a right or legal title to . . . [t]o qualify for; to furnish with proper grounds for seeking or claiming." black's law dictionary 532 (6th ed. 1990). Thus, by stating that judgment debtors are "entitled" to the statutory exemptions, the Montana Legislature has given judgment debtors a legal right to claim and benefit from those exemptions.

¶70 The County posits, however, that we construed the statutory exemptions from execution as personal privileges, rather than entitlements, in Tetrault v. Ingraham (1918), 54 Mont. 524, 171 P. 1148, and Matter of Estate of Sandvig (1991), 250 Mont. 220, 819 P.2d 184. From that premise, it argues that a judgment debtor has no property right entitling him or her to claim personal property as exempt from execution. We disagree.

¶71 In Tetrault, the sheriff levied on and sold property the judgment debtor previously had sold to another person. Tetrault, 54 Mont. at 527, 171 P. at 1149. In subsequent litigation, the purchaser at the sheriff's sale asserted that the property had been exempt from execution at the time he purchased it. Tetrault, 54 Mont. at 525-26, 171 P. at 1149. In discussing on appeal whether the property was exempt from execution, we determined that the right to claim an exemption is a "personal privilege" of the judgment debtor which can be--and was--waived by the debtor when he sold the property prior to the sheriff's sale. Tetrault, 54 Mont. at 528, 171 P. at 1149. The ability to claim property exemptions was a "personal privilege" because the exemption was personal to the debtor and did not attach to, or transfer with, the property when sold to another. In other words, Tetrault's "personal privilege" language related to who could claim the exemption; it did not relate to whether the exemption from execution was an entitlement or a privilege for purposes of determining whether a property right exists in the exemptions. Thus, Tetrault is not

authority for the proposition that a judgment debtor does not have a property interest in statutory exemptions from execution.

¶72 Nor does <u>Estate of Sandvig</u> support the County's argument that Dorwart does not have a property interest in claiming statutory exemptions from execution. There, the appellants owned a 1929 Model A Ford which was levied on and sold in partial satisfaction of a judgment debt owed to the Sandvig estate. They did not claim the Ford as exempt property. <u>Estate of Sandvig</u>, 250 Mont. at 221-22, 819 P.2d at 185. Subsequently, the appellants petitioned for bankruptcy, claiming a different vehicle as exempt property under the bankruptcy statutes. Several weeks later, they petitioned the district court for recovery of $1,200 each from the Sandvig estate for their exemption interest as judgment debtors in the Ford. The district court denied their petition on the basis that the appellants had waived their exemption interest in the Ford by obtaining an exemption for a different vehicle in the bankruptcy proceeding. We affirmed and, in doing so, reiterated the statement from <u>Tetrault</u> that the statutory exemptions from execution are personal privileges. <u>Estate of Sandvig</u>, 250 Mont. at 222, 819 P.2d at 185-86. We did not further discuss or refer to the "personal privilege" language and, as in <u>Tetrault</u>, that language did not relate to whether the judgment debtors had a property interest in statutory exemptions. Indeed, as in <u>Tetrault</u>, no issue was raised or discussed in <u>Estate of Sandvig</u> regarding whether the appellants had a property interest in the statutory exemptions from execution which would raise due process concerns.

¶73 The State also argues that Dorwart does not have a property interest in the exemptions which is protected under the due process provisions of the Montana and United States Constitutions. The State points out that, pursuant to § 25-13-609, MCA, Dorwart's interest in the listed statutory exemptions from execution lies only in the specified monetary amounts provided in the statute, rather than in any particular item of property, and, as a result, Dorwart cannot have a protected property interest in the specific items of personal property. The State asserts that the interest protected by the statutory exemption is merely the debtor's equity interest, up to the statutorily established amount, in the property's value. Under the State's theory, the debtor is not entitled to retain possession of exempt property which has a value greater than the statutorily exempt amount, but is entitled only to the exempted value of that property. Thus, according to the State, the debtor does not have a protected property interest in the specified item of personal property.

¶74 The State misapprehends the nature of the protected property interest at issue here. A judgment debtor's property interest lies in the statutory exemption from execution itself and the ability to claim that exemption. The resulting benefit to the debtor from claiming a statutory exemption from execution may be either retaining possession of the item of property itself or receiving money equivalent to the statutorily exempt amount, depending on the nature and value of the particular item of property. Regardless of the form in which the debtor ultimately receives the benefit of the exemption from execution, he or she is entitled to claim the statutory exemption and that is the property interest which is protected by the right to due process.

¶75 We conclude that, by providing that all Montana residents are entitled to specified exemptions from execution, the Legislature has conferred upon judgment debtors an entitlement to claim and benefit from those exemptions. We hold, therefore, that Montana judgment debtors have a property interest in the statutory exemptions from execution which is protected by the due process guarantees contained in the Montana and United States Constitutions.

B. Adequacy of due process provided by the post-judgment execution statutes

¶76 Having held that due process protects a judgment debtor's property interest in statutory exemptions from execution, we turn to the District Court's determinations that Montana's post-judgment execution statutes do not provide adequate due process and are, therefore, unconstitutional. In this regard, we observe that due process generally requires notice of a proposed action which could result in depriving a person of a property interest and the opportunity to be heard regarding that action. See Matter of Klos (1997), 284 Mont. 197, 205, 943 P.2d 1277, 1281.

¶77 The County argues that the District Court's ultimate conclusion that the statutes are unconstitutional is erroneous because the court failed to follow the United States Supreme Court's binding precedent in Endicott-Johnson Corp. v. Encyclopedia Press (1924), 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288. We disagree.

¶78 In Endicott-Johnson, the Supreme Court held that due process of law under the Fourteenth Amendment to the United States Constitution does not require that a judgment debtor be given notice and an opportunity to be heard prior to the issuance and execution of a writ of garnishment. When the debtor has been given an

opportunity to be heard and have his or her day in court regarding the underlying judgment, he or she must take notice of what will follow after entry of the judgment; no further notice or hearing is necessary before instituting supplemental proceedings to enforce the judgment. Endicott-Johnson, 266 U.S. at 288.

¶79 Endicott-Johnson addressed only whether notice and opportunity for a hearing must be afforded to a judgment debtor prior to the issuance and execution of a writ of garnishment. It did not address whether due process required notice and opportunity for a hearing after the writ has been issued and the debtor's monies garnished, so that the debtor might be allowed to assert any available exemptions from garnishment or execution. Indeed, the existence of statutory exemptions from garnishment or execution was not raised in Endicott-Johnson and the Supreme Court did not discuss whether statutory exemptions from execution or garnishment might affect due process considerations in such situations.

¶80 Nor are the additional cases on which the County relies as support for its assertion that Endicott-Johnson controls the due process issue before us applicable. While two of those cases cite to Endicott-Johnson for its holding that notice and opportunity for a hearing are not required prior to a writ of garnishment or execution being issued, neither case addressed whether due process requires notice and opportunity for a hearing after a debtor's money has been garnished or property levied on so that a debtor may effectively assert available exemptions. See Langford v. State of Tennessee (W.D. Tenn. 1973), 356 F.Supp. 1163, 1164; Moya v. DeBaca (D. N.M. 1968), 286 F.Supp. 606, 608. The remaining two cases on which the County relies, while recognizing the continued viability of the Endicott-Johnson holding within its factual parameters, explicitly distinguish Endicott-Johnson from, and hold it inapplicable to, situations where statutory exemptions from execution or garnishment exist of which the debtor may be erroneously deprived if not afforded notice and opportunity to be heard at some point during the post-judgment proceedings. See Neely v. Century Finance Co. of Ariz. (D. Ariz. 1985), 606 F.Supp. 1453, 1461-62; Cagle v. Carlson (Ariz. App. 1985), 705 P.2d 1343, 1348.

¶81 Moreover, we observe that many of the recent federal cases which have addressed the constitutionality of state statutory schemes for post-judgment garnishment or execution also have determined that Endicott-Johnson is factually distinguishable and, therefore, not dispositive in cases where the statutes at issue grant judgment debtors the right to claim various exemptions from execution. As the

United States Court of Appeals for the Tenth Circuit has noted, Endicott-Johnson did not consider the existence of exempt property which might be erroneously seized and sold if some post-judgment notice and hearing are not accorded to the debtor. Aacen v. San Juan County Sheriff's Dept. (10th Cir. 1991), 944 F.2d 691, 695 (citations omitted).

> "*Endicott's* rationale assumed that the judgment resolved all outstanding issues between the debtor and the creditor, collection being a ministerial act. However, the judgment does not resolve whether certain property is exempt." *McCahey v. L.P. Investors* [(2nd Cir. 1985), 774 F.2d 543, 548]. That is, while the judgment resolves the issue whether a debt exists, it does not address whether the creditor can seek satisfaction of the debt from this particular asset.

Aacen, 944 F.2d at 695; see also Finberg v. Sullivan (3rd Cir. 1980), 634 F.2d 50, 56-57; Deary v. Guardian Loan Co., Inc. (S.D.N.Y. 1982), 534 F.Supp. 1178, 1185; Kirby v. Sprouls (C.D. Ill. 1989), 722 F.Supp. 516, 520. Indeed, some cases have questioned Endicott-Johnson's continued viability in light of modern-day due process jurisprudence. See, e.g., Finberg, 634 F.2d at 56-57; Dionne v. Bouley (1st Cir. 1985), 757 F.2d 1344, 1351; Deary, 534 F.Supp. at 1185-86.

¶82 We are persuaded by the reasoning of the above cases. As a result, we conclude that, insofar as Dorwart asserts that Montana's post-judgment execution statutes violate due process of law because they do not adequately protect his property interest in the exemptions available thereunder, Endicott-Johnson is not controlling and the District Court did not err in so determining. Having rejected the County's threshold assertion of error, we proceed to address the substantive basis for the District Court's conclusion that Montana's post-judgment execution statutes are unconstitutional because they do not provide judgment debtors with notice of the seizure of property, notice of the statutory exemptions from execution, notice of procedures by which to claim exemptions and of the availability of a hearing regarding those exemptions, and a prompt hearing on whether the property is exempt.

¶83 In addressing whether statutes governing post-judgment execution and garnishment procedures provide adequate due process protections, many of the federal cases cited above apply a balancing test culled from Mathews v. Eldridge

(1976), 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18. <u>See</u>, <u>e.g.</u>, <u>Aacen</u>, 944 F.2d at 695-96; <u>Dionne</u>, 757 F.2d at 1352; <u>Finberg</u>, 634 F.2d at 58; <u>Kirby</u>, 722 F.Supp. at 521.

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

<u>Mathews</u>, 424 U.S. at 335. Indeed, we previously have recognized and applied this balancing test in addressing the extent of procedural safeguards required to protect due process rights under other circumstances (see M.C. v. Department of Institutions (1984), 211 Mont. 105, 109-10, 683 P.2d 956, 958-59; Matter of M.F. (1982), 201 Mont. 277, 284-86, 653 P.2d 1205, 1208-09), and it is appropriate that we weigh the <u>Mathews</u> factors in our consideration of the due process issue here, as did the District Court.

## 1. Private Interests Involved

**¶84 Applying the first prong of the <u>Mathews</u> test, it is clear that the private interests of both the judgment creditor and the judgment debtor are affected by the official action of levying upon personal property under a writ of execution. The judgment creditor's interest in the process of executing on a judgment is to obtain the money or property to which the creditor is entitled. The creditor is owed a debt and has expended time and money in taking legal action to reduce that debt to a judgment. Having obtained a judgment against the debtor, the creditor has a strong interest in the speedy and inexpensive satisfaction of that judgment. Furthermore, if the creditor's ability to execute on the judgment is unduly delayed, there is a possibility that the debtor may dispose of the property or that the property may diminish in value, thus reducing the creditor's ability to satisfy the judgment.**

**¶85 The judgment debtor's interest in the execution process, on the other hand, is to preserve his or her ability to claim that certain property is not subject to execution. As we concluded above, judgment debtors have a property interest in the ability to claim statutory exemptions from execution and, thus, have a strong interest in their ability to initiate procedures by which to effectively claim those exemptions and**

preserve exempt property. This includes the debtor's interest in asserting the statutory exemptions from execution to which he or she is entitled and receiving a prompt determination of whether the property which has been, or is about to be, levied on is subject to execution.

¶86 While the creditor's interest in satisfying a judgment clearly overrides the debtor's interest in any nonexempt property, the debtor's interest outweighs that of the creditor as to any property which is statutorily exempt from execution. "Since the debtor has a significant interest in protecting exempt property from seizure, clearly, the debtor is entitled to procedural safeguards that do not adversely affect the creditor's adjudicated rights." Kirby, 722 F.Supp. at 521. Once the property is levied on, however, thereby removing the possibility that the debtor will destroy or conceal these assets, the creditor's interests are adequately preserved and the debtor's interest in the property becomes "very compelling." Aacen, 944 F.2d at 696; Dionne, 757 F.2d at 1352.

### 2. Risk of Erroneous Deprivation and Value of Other Procedural Safeguards

¶87 The second Mathews factor necessitates an examination of the post-judgment execution statutes, in light of the asserted procedural deficiencies of those statutes, to determine whether, under the statutory procedures, there is a risk that judgment debtors will be erroneously deprived of their property and whether requiring additional procedural safeguards would be valuable in reducing the risk of erroneous deprivation.

### a. notice of the seizure of property

¶88 Dorwart first asserts that the post-judgment execution statutes are procedurally inadequate because they fail to require that judgment debtors be notified of the seizure of their property either before or after the fact. Indeed, while Dorwart was provided with actual notice of the pending seizure of his property when he was served with the two writs of execution, there is no statutory requirement in the MCA that writs of execution be served upon a judgment debtor at any time. Nor do the statutes provide for any other method of notifying a judgment debtor that property has been seized in satisfaction of a judgment.

¶89 Without notice to a debtor that property will be, or has been, seized under a writ

of execution, a debtor's exempt property could be levied on and sold before the debtor was aware of the seizure, particularly if the property were not in the debtor's direct possession. Providing such notice to a debtor would protect the debtor's ability to assert the statutory exemptions from execution to which the debtor is entitled. It is clear, however, that a requirement that the debtor be notified of a seizure of property may detrimentally affect a creditor's interest by creating an opportunity for the debtor to secrete or dispose of property before the property can be levied on.

¶90 In recognition of these competing concerns, due process usually does not require that a debtor be given notice prior to issuance of a writ of execution or even prior to the levy on the property, as long as the debtor is given notice of the property seizure in a manner which protects the debtor's ability to assert exemptions. Dionne, 757 F.2d at 1352; Finberg, 634 F.2d at 59. However, "[o]nce the attachment is made, removing the possibility that the debtor will secrete his assets, the debtor must receive and be notified of a timely opportunity to challenge any sequestration of his property which the law makes unattachable." Dionne, 757 F.2d at 1352 (citations omitted). The additional procedural safeguard of providing a judgment debtor with notice at the time of or shortly after seizure would be valuable in decreasing the risk of an erroneous deprivation of the debtor's exempt property.

### b. notice of the statutory exemptions

¶91 Dorwart also asserts that the post-judgment execution statutes do not provide adequate due process because they do not require that debtors be informed of the existence of exemptions from execution. In this regard, the only notice of exemptions provided in this case was a reference at the bottom of each of the writs of execution directing the sheriff to satisfy the judgment out of any of Dorwart's property which was "NOT EXEMPT FROM EXECUTION." The writs did not indicate what property is statutorily exempt from execution or explain where a person could find information on available exemptions, and the post-judgment execution statutes do not require that judgment debtors be provided such information.

¶92 As we concluded above, judgment debtors have a protected property interest in the ability to claim and benefit from statutory exemptions from execution. That property interest could be lost if they are not informed that the exemptions exist because a debtor unaware of the exemptions likely will not claim them. Thus, there is a risk that debtors will be erroneously deprived of their interest in, and ability to

**claim, the statutory exemptions from execution.**

**¶93 In general, due process requires notice which, under the circumstances, is reasonably calculated to inform interested parties of the action and afford them an opportunity to present objections. <u>Aacen</u>, 944 F.2d at 697; <u>Finberg</u>, 634 F.2d at 61-62. Notice to a judgment debtor informing him or her of the availability of exemptions from execution and where information about those exemptions can be found would preserve the debtor's opportunity to present objections to the levy on, and possible sale of, property which is exempt from execution. To that extent, the additional procedural requirement that debtors be provided with notice of the existence of exemptions and how to locate more information about them would be valuable in reducing the risk of erroneously depriving judgment debtors of their interest in claiming statutory exemptions from execution.**

> c. notice of procedures by which to claim exemptions and of the availability of a hearing regarding those exemptions

**¶94 Dorwart next contends that the statutes at issue are procedurally inadequate because they do not provide for notice to a judgment debtor of procedures whereby the debtor may claim property, wages or benefits as exempt from execution and receive a hearing on that claim. Indeed, Montana's post-judgment execution statutes do not provide any means by which statutory exemptions can be claimed and determined by a court of law. In response to this statutory vacuum, several methods of claiming exemptions have developed and been judicially approved (<u>see</u>, <u>e.g.</u>, Welch v. Huber (1993), 262 Mont. 114, 115, 862 P.2d 1180, 1181; State ex rel. Bartol v. Justice of the Peace Court (1936), 102 Mont. 1, 5, 55 P.2d 691, 691-92), but none have been incorporated into the execution statutes. It is clear that Dorwart availed himself of one of these methods by moving for the release of his property and to quash the writs of execution, which resulted in the Justice Court ordering the return of his seized property. However, Dorwart did not receive actual notice of any available procedures, statutory or otherwise, to claim exemptions from execution. The writs of execution issued in this case were completely silent as to whether a process existed by which to assert exemption rights and how to initiate such a process. Furthermore, the statutory post-judgment execution procedures contain no provision for affording a judgment debtor notice of the availability of any means of asserting exemptions from execution and receiving a hearing on those exemptions.**

¶95 The failure to provide notice of any procedures, whether statutory or nonstatutory, by which a judgment debtor may claim the available exemptions from execution and receive a hearing on those claims creates a risk that the debtor may be erroneously deprived of exempt property. Without such notice, a judgment debtor could either fail to pursue a legitimate remedy or not discover the existence of a remedy until it is too late to reclaim the property. In light of the complete absence in Montana's post-judgment execution statutes of provisions for notifying judgment debtors of procedures to claim exemptions from execution, it is clear that additional procedural safeguards would be valuable.

d. prompt hearing on whether property is exempt

¶96 Finally, Dorwart asserts that the post-judgment execution statutes are unconstitutional because they fail to specifically provide for a hearing on claimed exemptions available under the post-judgment execution procedures or for prompt disposition of exemption claims. Due process clearly requires that a person be given an opportunity for a hearing at which to present objections to an action which could result in depriving the person of a property interest. See Matter of Klos, 284 Mont. at 205, 943 P.2d at 1281; Aacen, 944 F.2d at 697. In the present case, Dorwart asserted his exemption claims by way of his motion for release of his property and to quash the writs of execution and, eventually, the property levied on was returned to him. However, the record does not indicate whether Dorwart ever received a hearing on his exemption claims.

¶97 It is likely that, in most cases, the judgment creditor will have levied on the property prior to the debtor asserting exemptions from execution and, as a result, the longer a hearing on, and disposition of, the debtor's exemption claims is delayed, the longer the debtor is deprived of possession of the exempt property. Thus, absent a prompt hearing on a judgment debtor's claim that property is exempt from execution, there is a risk of deprivation of the debtor's property. Requiring a prompt hearing and decision on whether a judgment debtor's property is exempt from execution would be valuable in diminishing this risk of an erroneous deprivation of the debtor's interest.

3. Government's Interest

¶98 Application of the Mathews test also entails weighing the state's interest in the

post-judgment execution process, including the fiscal and administrative burdens which may be imposed on the state by requiring additional procedural safeguards. Clearly, the state has an interest in enforcing its laws and in preserving the integrity of the judicial system through enforcement of court judgments. That interest includes protecting a judgment creditor's ability to collect on an adjudicated debt, while conserving the limited financial and administrative resources available to it. The state's interest also must encompass a judgment debtor's entitlement to statutory exemptions from execution, however, in order to avoid favoring one party's legal rights over those of the other.

¶99 A requirement that judgment debtors be given notice of a seizure of their property pursuant to a writ of execution, notice of statutory exemptions from execution, and notice of procedures by which to claim exemptions from execution and receive a hearing on those exemption claims would further the state's interest in protecting the debtor's right to the exemptions without significantly impacting on the creditor's interest in satisfying the judgment, since the creditor is not entitled to execution on exempt property. Nor would the state's fiscal and administrative burdens be significantly increased, since the notice of property seizures, availability of exemptions and procedures by which to claim exemptions would require only the printing of new, or revising of old, writ of execution forms.

¶100 It is clear, however, that requiring a prompt hearing on a judgment debtor's claim that property is exempt from execution affects the state's interests by adding to both its administrative and fiscal responsibilities. This is especially apparent in the additional burden placed upon the state's judicial system by requiring prompt hearings and disposition of the debtor's claims.

4. Balancing the Mathews Factors

¶101 We determined above that additional procedural requirements in the execution process would be valuable in reducing the risk of an erroneous deprivation of a judgment debtor's interest in the ability to claim and benefit from statutory exemptions from execution. The first three requirements are notices to judgment debtors of the seizure of their property under a writ of execution, either at the time of the seizure or shortly thereafter; of the availability of exemptions from execution and where information about those exemptions can be found; and of procedures by which to claim exemptions and receive a hearing on those claims. Providing this

information to debtors would protect their property right in claiming statutory exemptions from execution, yet not preclude the judgment creditor from proceeding with an execution sale of any nonexempt property. Furthermore, the burden placed on the state by requiring these notices is slight. It amounts to nothing more than notifying the judgment debtor that particular property has been seized and including information about available exemptions from execution and the existence of procedures by which to claim them in the writ of execution itself. Moreover, the notice of available exemptions need not include a detailed and exhaustive list of all exemptions; it need merely provide notice of the existence of exemptions from execution and how to locate more information about them. See, e.g., Aacen, 944 F.2d at 698. We conclude that, in weighing the interests of the parties involved in execution proceedings, the interest of the judgment debtor in claiming property exemptions substantially outweighs any burden placed on the creditor or the state by these additional notice requirements.

¶102 The final requirement we determined would be beneficial in reducing the risk of erroneously depriving a judgment debtor of his or her interest in claiming exemptions from execution is a prompt hearing and disposition of exemption claims. Such a requirement clearly benefits both the debtor and the creditor by reducing the time involved in resolving their respective claims to the property at issue and furthers the state's interest in the integrity of the judicial system. While the requirement of a prompt hearing increases the state's administrative and fiscal burdens, it also advances the state's interests in both protecting the debtor's interest in effectively claiming exemptions from execution and the creditor's interest in timely satisfying the judgment. See Kirby, 722 F.Supp. at 523. In light of the judgment debtor's property interest in the ability to claim exemptions from execution, the debtor's strong interest in retaining--or recovering--property which is exempt from execution and the risk that, absent a prompt hearing on the exemption claims, the debtor will be unnecessarily deprived of exempt property for a substantial period of time, we conclude that the debtor's interests here outweigh the cost, both fiscally and administratively, imposed upon the state.

¶103 In summary, we conclude that Montana's post-judgment execution statutes violate state and federal constitutional guarantees of due process of law because they do not provide for notice to a judgment debtor of the seizure of the debtor's property, of the availability of statutory exemptions from execution and where to locate additional information about them, and of the availability of procedures by

which to claim exemptions from execution. We further conclude that the statutes are deficient from a due process standpoint because they do not provide for a prompt hearing on claimed exemptions. As a result, we hold that the District Court did not err in determining that Montana's post-judgment execution statutes are unconstitutional because they do not provide the procedural due process of law required by Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment to the United States Constitution.

¶104 3. Are Caraway and Ames entitled to qualified immunity from individual liability for Dorwart's § 1983 claims?

¶105 The District Court concluded that Caraway and Ames were entitled to qualified immunity from individual liability for Dorwart's due process claims based on its determination that the constitutional notice-related rights which were violated were not clearly established at the time the deputies acted pursuant to the writs of execution and because the deputies could not reasonably have understood that their actions violated Dorwart's rights. As a result of its erroneous determination that Caraway and Ames did not violate Dorwart's search and seizure rights, the District Court did not address whether they were entitled to qualified immunity for entering his residence and seizing his property. Dorwart contends that the District Court's qualified immunity conclusion regarding his due process claim was erroneous and that the deputies also are not entitled to qualified immunity on his search and seizure claim. Therefore, we address qualified immunity vis-a-vis both the due process claim and the search and seizure claim.

¶106 Dorwart's due process claim requested only a declaratory judgment and permanent injunction. He did not seek monetary damages for that claim. Qualified immunity is a defense to damages liability; it is not available in actions for declaratory or injunctive relief. American Fire, Theft and Collision Managers, Inc. v. Gillespie (9th Cir. 1991), 932 F.2d 816, 818. Therefore, we conclude that the District Court erred in applying qualified immunity in the context of Dorwart's due process claim.

¶107 Qualified immunity shields government officials performing discretionary functions from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald (1982), 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73

L.Ed.2d 396, 410. In analyzing whether an official is entitled to qualified immunity, a court must identify the right violated, determine whether the right was clearly established at the time of the violation and, if the right was clearly established, determine whether a reasonable person or official would have known that his or her conduct violated that right. Hamilton v. Endell (1992), 981 F.2d 1062, 1066; Orozco v. Day (1997), 281 Mont. 341, 350, 934 P.2d 1009, 1014. In this regard, a plaintiff has the initial burden of proving that the right was clearly established at the time of the violation. If--but only if--the plaintiff makes this showing, the burden shifts to the defendant asserting qualified immunity to prove that his or her conduct was reasonable even though it violated the law. See Hamilton, 981 F.2d at 1066.

¶108 Dorwart correctly asserts that he had a clearly established constitutional right to be free from searches and seizures in his home in the absence of a search warrant or one of the exceptions to the warrant requirement. See U.S. Const. amend. IV; Art. II, Sec. 11, Mont. Const.; State v. Bullock (1995), 272 Mont. 361, 374, 901 P.2d 61, 70. This general statement of the right to be free from unreasonable searches and seizures is too broad, however, for purposes of determining the "clearly established right" portion of the qualified immunity determination under given circumstances. Rather, the right which has been violated must be clearly established in a more particularized, relevant sense. See Aacen, 944 F.2d at 701; Anderson v. Creighton (1987), 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531. While a plaintiff need not show that the specific action in question previously has been held unlawful, it must be demonstrated that, under the particular circumstances of the case and in light of pre-existing law, the unlawfulness of the action taken was apparent. Anderson, 483 U.S. at 640. Under the circumstances of this case, Dorwart must demonstrate that, at the time the deputies entered his home, it was clearly established that the writs of execution did not authorize their entry in the absence of a warrant or an established exception to the warrant requirement and that, as a result, they violated his right to be free from unreasonable searches and seizures.

¶109 In this regard, the specific issue presented and resolved above--whether a writ of execution, in and of itself, authorizes officers to enter a person's home and seize property therein--is one of first impression in Montana. In the only other Montana case addressing the extent of an official's authority when acting pursuant to a writ, we concluded that a writ of attachment provides an official with "the right to enter a business place against the will of the occupant, permission having been asked and refused, and to seize the property therein belonging to the occupant and subject to

levy." Ramsey, 27 Mont. at 156, 69 P. at 712. Our 1902 decision in Ramsey is the only Montana case interpreting the scope of authority derived from a writ directing a levy on property. While Ramsey did not address or resolve whether such an entry would survive constitutional scrutiny, it certainly appeared to authorize an official acting pursuant to a writ directing the levy on a person's property to enter and take possession of the premises in which property subject to execution was located in order to effectuate the execution without the necessity of a warrant.

¶110 Moreover, while the cases on which we relied in resolving issue one above-- Camara, G.M. Leasing and Hinchey--had been decided prior to Ames' and Caraway's unlawful entry into Dorwart's home, it would not have been clear that we would interpret those cases as supporting our conclusion that the deputies' actions violated Dorwart's constitutional rights. Camara and G.M. Leasing, while providing guidance in addressing the scope of warrantless administrative searches and seizures, did not directly address actions taken pursuant to a writ of execution. Indeed, in neither case did there appear to be any type of judicial authorization for entry into the complainant's premises. See Camara, 387 U.S. at 526; G.M. Leasing, 429 U.S. at 344-46. Furthermore, while Hinchey directly addressed the issue raised in the present case, it is merely persuasive authority, not binding precedent.

¶111 Additionally, the Supreme Court previously had expressly stated that an officer's entry into private premises to levy on property pursuant to a writ of execution is not subject to Fourth Amendment constraints. See Boyd, 116 U.S. at 624. While we determined above that Boyd does not control our resolution of the search and seizure issue before us, the Supreme Court has never expressly overruled that portion of Boyd and, thus, it remained a potential source of authority on which to base a conclusion that Ames and Caraway did not violate Dorwart's rights when they entered his home.

¶112 We conclude that, under the law as it existed at the time Ames and Caraway entered Dorwart's home and levied upon his property, it was not clearly established that the writs of execution pursuant to which the deputies acted did not, in and of themselves, authorize entry into a private residence or that their entry pursuant only to the writs of execution violated Dorwart's right to be free from unreasonable searches and seizures. Because Dorwart has not satisfied his initial burden of proving that the right which the deputies violated was clearly established at the time of the violation, we need not address whether it was objectively reasonable for Ames and

Caraway to believe their conduct was lawful. See Hamilton, 981 F.2d at 1066. We hold that Caraway and Ames are entitled to qualified immunity from individual liability for Dorwart's § 1983 search and seizure claim.

¶113 4. Did the District Court err in granting summary judgment in favor of Stillwater County and Brophy, in his capacity as Sheriff, on Dorwart's § 1983 search and seizure claim?

¶114 As we stated above in addressing the search and seizure issue, § 1983 provides a cause of action for a person who is deprived of a federally protected right by another person acting under color of state law. 42 U.S.C. § 1983; Mysse, 279 Mont. at 260, 926 P.2d at 769. Generally, § 1983 claims are brought against public officials in their individual capacities for their actions taken under color of state law. See Orozco, 281 Mont. at 348, 934 P.2d at 1013. However, municipalities and local governmental entities also may be sued as "persons" under § 1983. Orozco, 281 Mont. at 347, 934 P.2d at 1012.

¶115 A local governmental entity may be held liable under § 1983 only when it is shown that the entity itself caused the constitutional violation at issue through the implementation of a policy or custom of that governmental entity. City of Canton, Ohio v. Harris (1989), 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412, 424 (citing Monell v. New York City Dept. of Social Services (1978), 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611). Thus, in order to impose liability on a local governmental entity under § 1983, a plaintiff must establish

> "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.' "

Buhr on Behalf of Lloyd v. Flathead County (1994), 268 Mont. 223, 239, 886 P.2d 381, 390 (quoting Oviatt By and Through Waugh v. Pearce (9th Cir. 1992), 954 F.2d 1470, 1474). Similarly, a supervisor, such as Brophy here, cannot be held liable under § 1983 unless it is demonstrated that the supervisor's adoption of a plan or policy authorized or approved of the conduct alleged to have resulted in the constitutional deprivation. See Bergquist v. County of Cochise (9th Cir. 1986), 806 F.2d 1364, 1369-70.

¶116 The District Court determined that Dorwart failed to demonstrate that either Stillwater County or Brophy had adopted policies regarding levy and execution under a writ of execution other than the "policy" of relying on Montana statutes and, therefore, that Dorwart had not established the elements set out in Buhr. On that basis, it concluded that Dorwart's § 1983 claims against Stillwater County--and, by implication, Brophy--failed as a matter of law. We note that the only § 1983 claim on which Dorwart has prevailed is his claim that Caraway and Ames violated his Fourth Amendment rights when they entered his home and seized his property and, as a result, we review the District Court's conclusion here only as it relates to this search and seizure claim.

¶117 Dorwart argues that the District Court's conclusion was erroneous because he established that the actions of Ames and Caraway in entering his residence and seizing his property were carried out in the usual and customary manner of the Stillwater County Sheriff's Office. He further asserts that this customary procedure was the policy which resulted in the deprivation of his constitutional rights and that, by allowing deputies to proceed under this policy, Brophy and Stillwater County failed to adequately train and supervise the deputies. According to Dorwart, this failure to train and supervise amounted to "deliberate indifference" to his constitutional rights. We disagree.

¶118 A governmental entity's failure to adequately train or supervise its law enforcement officers may be the basis of § 1983 liability when that failure to train or supervise amounts to deliberate indifference to the rights of persons with whom the officers come into contact. Harris, 489 U.S. at 388. However, "deliberate indifference" in this context occurs only when the need for different action is so obvious, and the inadequacy of the procedure used is so likely to result in violations of constitutional rights, that it is reasonable to say the policymakers were deliberately indifferent to the need to change the policy. Buhr, 268 Mont. at 240, 886 P.2d at 391 (citations omitted); Harris, 489 U.S. at 390. Thus, in order for Dorwart to satisfy the deliberate indifference element for imposing liability under § 1983, he must establish that Stillwater County's customary procedures for serving and executing a writ of execution, as implemented by Ames and Caraway in this case, obviously were constitutionally inadequate and that Stillwater County and Brophy were deliberately indifferent to the need to remedy those procedural inadequacies.

¶119 As we discussed above in addressing the issue of qualified immunity, it was not

clearly established prior to this case that a law enforcement officer's entry into a person's residence and seizure of property therein pursuant solely to a writ of execution violates the person's constitutional right to be free from unreasonable searches and seizures. Montana statutes governing post-judgment execution procedures do not define the extent of an officer's authority when executing a writ of execution. Moreover, the only Montana case addressing the extent of implied authority under a writ held that the officer was authorized to enter premises against the will of the occupant and levy upon property located therein. See Ramsey, 27 Mont. at 156, 69 P. at 712.

¶120 We conclude that when Ames and Caraway entered Dorwart's residence and seized his property, the constitutional inadequacy of Stillwater County's customary procedures for executing a writ of execution was not obvious and, as a result, Stillwater County and Brophy were not deliberately indifferent to the need to remedy the inadequacies we have now determined exist. Thus, Dorwart has failed to establish the necessary "deliberate indifference" element, as required under Buhr, for imposing § 1983 liability on a governmental entity. We hold, therefore, that the District Court did not err in granting summary judgment in favor of Stillwater County and Brophy, in his capacity as Sheriff, on Dorwart's § 1983 search and seizure claim.

¶121 5. Did the District Court err in granting summary judgment in favor of the County on Dorwart's conversion and trespass claims and Harry Dorwart's trespass claim?

¶122 In the amended complaint, Dorwart and his father asserted conversion and trespass claims against the County. The District Court granted summary judgment in favor of the County on these claims on the basis that, since it had determined that the writs of execution authorized Ames and Caraway to enter Dorwart's residence and levy upon his property therein, Dorwart could not establish the unauthorized entry element of a trespass claim or the unauthorized seizure of control over property element of a conversion claim.

¶123 Dorwart argues that, because the District Court erred in determining that the writs of execution authorized the deputies to enter his residence and seize his property, the court also erred in determining as a matter of law that the "unauthorized" elements of his tort claims could not be established. He contends

that, in the event this Court holds--as we have above--that the writs of execution did not authorize Ames and Caraway to enter his residence and seize his property, his trespass and conversion claims are viable and should be reinstated. We agree that, given our holding on issue one, the basis on which the District Court concluded that Dorwart and his father could not establish their tort claims is incorrect.

¶124 The County reiterates here, however, the alternative argument it raised in the District Court with regard to the tort claims. According to the County, Dorwart's tort claims still fail because the deputies were justified in their execution of writs which were regular on their face, issued by competent authority and appeared, at the time, to authorize the deputies' actions. In this regard, the County essentially contends that Ames and Caraway could not reasonably have understood that their actions were not authorized by the writs of execution and, therefore, none of the defendants should be liable for damages. The District Court did not reach this argument because of its ruling that the writs authorized the deputies' actions. However, we will "affirm district court decisions which are correct regardless of the court's reasoning in reaching the decision." Clark, 279 Mont. at 286, 927 P.2d at 999 (citation omitted). Thus, we examine the County's alternative argument.

¶125 We previously have held that actions of law enforcement officers cannot be tortious when the officers are proceeding on the basis of a reasonable, good faith understanding of the law and do not act with unreasonable violence or subject citizens to unusual indignity. Strung v. Anderson (Mont. 1975), 529 P.2d 1380, 1382 (citing Daly v. Pedersen (D. Minn. 1967), 278 F.Supp. 88, 93; Harri v. Isaac (1940), 111 Mont. 152, 107 P.2d 137; Wheeler v. Moe (1973), 163 Mont. 154, 515 P.2d 679; Meinecke v. McFarland (1949), 122 Mont. 515, 206 P.2d 1012). We further opined that "it would put too great a burden on law enforcement officers to make them subject to damages every time they miscalculated in what a court of last resort would determine constituted an invasion of constitutional rights." Strung, 529 P.2d at 1381.

¶126 We held above that, at the time Ames and Caraway acted pursuant to the writs of execution, it was not clearly established that their actions violated Dorwart's constitutional rights. Thus, when the deputies entered Dorwart's home to execute the writs of execution according to procedures which appeared to be appropriate under then-existing Montana law, they were acting on a "reasonable, good faith understanding of the law." See Strung, 529 P.2d at 1382. Furthermore, Dorwart has not alleged--and the record does not suggest--that the deputies acted with

unreasonable violence or subjected him to unusual indignity. Strung, 529 P.2d at 1382. We conclude, therefore, that the actions of Ames and Caraway in entering Dorwart's residence and levying upon property therein were not tortious as a matter of law.

¶127 We hold that the District Court did not err in granting summary judgment in favor of the County on the state law tort claims for conversion and trespass asserted by Dorwart and his father.

¶128 6. Did the District Court err in concluding that Dorwart is not entitled to attorney's fees?

¶129 The District Court determined that the only statute under which Dorwart potentially could be awarded attorney's fees was 42 U.S.C. § 1988 (§ 1988), which provides that a prevailing claimant in an action brought pursuant to § 1983 may be awarded attorney's fees at the court's discretion. The court concluded that Dorwart was not entitled to attorney's fees for Dorwart's § 1983 search and seizure claim based on its erroneous determination that the deputies' actions had not violated Dorwart's right to be free from unreasonable searches and seizures. While the District Court erred in denying Dorwart attorney's fees on that basis, we conclude that its overall determination that Dorwart is not entitled to attorney's fees under § 1988 is correct. We will affirm a district court's decision which is correct regardless of the court's reason for that decision. Clark, 279 Mont. at 286, 927 P.2d at 999 (citation omitted).

¶130 Dorwart has prevailed on his claim that the County's actions violated his right to be free from unreasonable searches and seizures under the Montana and United States Constitutions. He argues that, insofar as his search and seizure claim established a violation of the Fourth Amendment to the United States Constitution for purposes of a § 1983 action, he is entitled to attorney's fees pursuant to § 1988.

¶131 It is true that a successful § 1983 claimant may be awarded attorney's fees under § 1988 regardless of the fact that qualified immunity prevents liability for monetary damages. See Jackson v. Galan (5th Cir. 1989), 868 F.2d 165, 168 (citing Pulliam v. Allen (1984), 466 U.S. 522, 543-44, 104 S.Ct. 1970, 1981-82, 80 L.Ed.2d 565, 580). However, there are cases where attorney's fees should be denied because special circumstances exist which would render an award of attorney's fees unjust.

Blanchard v. Bergeron (1989), 489 U.S. 87, 89, 109 S.Ct. 939, 942, 103 L.Ed.2d 67, 72 (citing Newman v. Piggie Park Enterprises, Inc. (1968), 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263, 1266). We conclude that such special circumstances exist in the present case.

¶132 Where a § 1983 claim is derived from the actions of a county and its officers in enforcing or following state laws and, thereby, effectuating state policy, that county and its officers should not be subject to liability for attorney's fees resulting from the claim. See, e.g., Familias Unidas v. Briscoe (5th Cir. 1980), 619 F.2d 391, 406; Minnesota Council of Dog Clubs v. City of Minneapolis (Minn. Ct. App. 1995), 540 N.W.2d 903, 906. The actions taken by Ames and Caraway in executing the writs at issue here were pursuant to Stillwater County's customary procedures for the execution of a writ issued in conformance with the Montana execution statutes. Indeed, in levying upon Dorwart's personal property, the deputies were enforcing the public policy of Montana regarding post-judgment executions as set forth in statutes duly enacted by the Legislature and they were, therefore, effectuating state policy rather than a policy promulgated by the County. As a result, we conclude that awarding attorney's fees against the County for Dorwart's § 1983 search and seizure claim would be unjust.

¶133 Dorwart also has prevailed on his declaratory judgment action seeking a declaration that Montana's post-judgment execution statutes are unconstitutional because they do not provide adequate due process of law, and he asserts that he is entitled to attorney's fees on that claim. Montana has long followed the rule that attorney's fees will not be awarded to a prevailing party absent statutory or contractual authority for such an award. Tanner v. Dream Island, Inc. (1996), 275 Mont. 414, 429, 913 P.2d 641, 650. No statute authorizes an award of attorney's fees in a declaratory judgment action. McKamey v. State (1994), 268 Mont. 137, 148, 885 P.2d 515, 522. Furthermore, no contract authorizes such an award in this case. Thus, we conclude that Dorwart is not entitled to attorney's fees for prevailing on his claim brought under Montana's Uniform Declaratory Judgments Act.

¶134 Dorwart also argues that he is entitled to attorney's fees for prevailing on the search and seizure and privacy claims he brought under Article II, Sections 10 and 11 of the Montana Constitution. As discussed above, the District Court's consideration of Dorwart's state constitutional claims terminated prematurely as a result of its erroneous determination that no state constitutional violations had

occurred. The same is true with regard to the court's consideration of Dorwart's attorney's fees arguments regarding those claims. Thus, we conclude that Dorwart's arguments regarding entitlement to attorney's fees on his claims under Article II, Sections 10 and 11 of the Montana Constitution must be remanded in conjunction with our remand of those constitutional claims for further proceedings.

¶135 Affirmed in part, reversed in part and remanded for further proceedings.

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

Justice W. William Leaphart, specially concurring.

¶136 I concur in the Court's resolution of Issues 1, 2, 4, 5 and 6. I specially concur as to Issue Number 3: qualified immunity. As the Court recognizes, in analyzing whether an official is entitled to qualified immunity, a court must identify the right violated, determine whether the right was clearly established at the time of the violation and, if the right was clearly established, determine whether a reasonable person or official would have known that his or her conduct violated that right. Hamilton v. Endell (1992), 981 F.2d 1062, 1066; Orozco v. Day (1997), 281 Mont. 341, 350, 934 P.2d 1009, 1014. The Court then goes on to apply qualified immunity based on its conclusion that, given the state of case law as of the time of the defendants' entry into Dorwart's home, it was not clearly established that an entry into Dorwart's home pursuant to a writ of execution violated his right to be free from unreasonable searches and seizures.

¶137 I, too, would find qualified immunity but for somewhat different reasons. "Qualified immunity 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.' " Boreen v. Christensen (1996), 280 Mont. 378, 383-84, 930 P.2d 67, 70 (quoting Hunter v. Bryant (1991), 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589, 596 (citation omitted)).

I would conclude that the right to be free from unreasonable searches and seizures is (and was) clearly established under Article II, Section 11 of the Montana Constitution, but that, given the state of the case law as of the date of the entry and given that the process utilized by Ames and Caraway is the same as has been used by levying officers in this state since territorial days, a reasonable person or official would not have known that his or her conduct violated that right.

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

¶138 I concur with the majority's conclusion that when Caraway and Ames entered Russell Dorwart's residence without a warrant and without permission, they violated his right to be free from unreasonable searches and seizures, which is guaranteed by both the Fourth Amendment to the Federal Constitution, and Article II, Section 11, of the Montana Constitution. I also concur with the majority's conclusion that Montana's post-judgment execution statutes deny procedural due process in violation of the Fourteenth Amendment to the Federal Constitution, and Article II, Section 17, of the Montana Constitution, and that implementation of those procedural protections described by the majority is necessary to meet due process requirements.

¶139 However, I dissent from those parts of the majority opinion which conclude that Ames and Caraway were entitled to qualified immunity, that the § 1983 claim against Brophy and Stillwater County was properly dismissed, and that the plaintiffs' claims for trespass and conversion were properly dismissed.

¶140 The majority opinion begins with a cogent explanation of why Dorwart's right to be free from unreasonable searches and seizures was clearly violated, and then repudiates its own analysis in an effort to support its conclusion that in spite of the violation of Dorwart's constitutional rights, those who violated them have qualified immunity because the rights are not as evident as originally stated.

¶141 For example, the majority correctly points out that both the Fourth Amendment to the United States Constitution, and Article II, Section 11, of the Montana Constitution, guarantee to all people the right to be secure in their homes against unreasonable searches and seizures, as well as the fact that we have

repeatedly held for years that entry into a person's home without a warrant is per se unreasonable, with a few exceptions that are inapplicable here.

¶142 The majority also correctly points out that neither the writs which were issued in this case, nor the post-judgment execution statutes pursuant to which the writs were issued, authorize entry into a person's home for the purpose of executing on property in satisfaction of the creditor's judgment.

¶143 Finally, the majority correctly points out that search and seizure protections apply in the civil context, as well as the criminal context, that that principle has been clear since 1967, and that all of the authorities relied on by the defendants and the State of Montana are distinguishable by their facts.

¶144 In spite of all of these clearly correct conclusions, the majority then holds that

*Camara* and *G.M. Leasing*, while providing guidance in addressing the scope of warrantless administrative searches and seizures, did not directly address actions taken pursuant to a writ of execution. Indeed, in neither case did there appear to be any type of judicial authorization for entry into the complainant's premises.

What difference did it make if *Camara* and *G.M. Leasing* specifically dealt with writs of execution? They dealt with the issue of warrantless searches in a civil context and held that the Constitution was violated when there was no judicial authorization for the search. The writs in this case were no different because, as pointed out in another part of the majority opinion, they did not authorize the defendants to search Dorwart's home.

¶145 With the majority's decision, the exception of qualified immunity has now completely swallowed the rule of liability for violating another person's civil rights in Montana. If the right to be free from unreasonable searches and seizures, based on the Fourth Amendment to the United States Constitution, and Article II, Section 11, of the Montana Constitution, is not a clear right, then nothing is.

¶146 Because the obligation of state agents to stay out of people's homes without a warrant is so clearly set forth in the Federal and State Constitutions, it was incumbent upon the State to show some clear decision, statute, or other colorable authority which would have allowed entry into the plaintiff's home in spite of that constitutional right on the date in question. None has been offered, and the majority

cites none. In fact, as previously mentioned, the majority has done a capable job of distinguishing those authorities which have been cited by the defendants and the State.

¶147 The majority has imposed an impossible burden on the plaintiffs, which is to establish that some isolated decision or encyclopedic text could not be construed by those who wish to violate a person's rights in support of their conduct. In other words, the plaintiffs have to prove a negative in order to establish that they had a right which the majority initially concedes is clearly established.

¶148 I also dissent from the majority's conclusion that Brophy, in his capacity as Sheriff, and Stillwater County were entitled to summary judgment dismissing Dorwart's § 1983 claim against them. A local governmental entity and a supervisor of persons acting under color of state law are liable, as noted by the majority, for violations of constitutional rights when the violation results from that governmental entity's or that supervisor's policy. In this case, in response to written interrogatories, each defendant answered that the actions complained of (i.e., the illegal search of Dorwart's home and seizure of property found therein) were "the usual and customary manner of performing a seizure on a writ of execution in the County of Stillwater, Montana." In other words, it was the County's policy, as implemented by Brophy, the supervisor for Ames and Caraway, to apply writs of execution as search warrants, in spite of the fact that no statute authorized their use for that purpose and the plain language on the face of the writ included no such authorization. I would conclude that this practice and policy of Brophy and Stillwater County constituted "deliberate indifference" to Dorwarts' constitutional rights. The majority's decision to affirm the dismissal of Brophy and Stillwater County is based on the same unsound conclusion on which its qualified immunity decision is based--i.e., that Dorwart had no clearly established right prior to this case to be free from warrantless entry into and search of his home. I believe that conclusion is incorrect, as applied to Brophy and Stillwater County, for the same reasons it was incorrect when used to justify the majority's qualified immunity conclusion.

¶149 I also dissent from the majority's conclusion that Dorwarts' claims for trespass and conversion were properly dismissed because the officers who entered the home without permission and without a warrant acted on the basis of a good faith understanding of the law. The majority position might have some merit if the writs,

on their face, authorized entry into Dorwart's home for the purpose of their execution, or if the statutes pursuant to which the writs were issued authorized entry. However, neither is true. Furthermore, to suggest the ninety-six-year-old *Ramsey* decision, which did not even discuss the Fourth Amendment, provided cover for the illegal entry into Dorwart's home, in spite of subsequent U.S. Supreme Court decisions which clearly require a warrant, is the type of argument we would normally consider specious if made by a litigant appearing before this Court.

¶150 For all the same reasons set forth previously, I also dissent from the majority's denial of Dorwart's claim for attorney fees pursuant to 42 U.S.C. § 1988. However, it bears repeating that Dorwart's § 1983 claim was not based on the County's or its officers' enforcement of state laws. There were no state laws which authorized the entry into Dorwart's home without a warrant and without his permission. The majority acknowledged as much in the first part of its opinion. Therefore, its rationalization for denying Dorwart's attorney fees is especially inconsistent and unsound.

¶151 In summary, I concur with the majority's conclusions that Dorwart's rights to be free from unreasonable searches and seizures, to privacy, and to due process were violated. I dissent from the majority's conclusion that in spite of flagrant violations of Dorwart's constitutional rights, no one is accountable pursuant to 42 U.S.C. § 1983 because cover can be found in a nearly 100-year-old decision which had nothing to do with constitutional issues in the first place. I would reverse the District Court's judgment which dismissed Dorwarts' claim for damages pursuant to 42 U.S.C. § 1983 and remand for trial of Dorwarts' claims.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing concurring and dissenting opinion.

/S/ WILLIAM E. HUNT, SR.